*In re* McCONAUGHY'S ESTATE.

STONER *v.* McCONAUGHY'S ESTATE.

ESTATES OF DECEDENTS—IMPLIED CONTRACTS—SUPPORT AND CARE.
Evidence tending to show that decedent agreed to pay
claimant well for living with and caring for him, and to
see that the wife of claimant should have his house and
homestead, that decedent died testate and provided by
his will that a third person should have the house,
omitting any provision for claimant, *held*, to support a
verdict for the value of such services as claimant and his
wife actually performed, and to justify the court in deny-
ing defendant's motion to direct a verdict.

Error to Eaton; Smith, J. Submitted April 30,
1914. (Docket No. 128.) Decided July 24, 1914.

Henry Stoner presented his claim against the
estate of William McConaughy, deceased, for services
performed. From a finding of the commissioners on
claims disallowing the same in part claimant appealed
to circuit court. Judgment for claimant. Defendant
executor brings error. Affirmed.

*Elmer N. Peters,* for appellant.

*R. L. Sowers,* for appellee.

Testimony for claimant tended to prove that the
deceased, William McConaughy, a widower, living
alone in his brick house in the city of Charlotte, made
an arrangement with claimant and his wife, who had
no children, according to which they, claimant and his
wife, left their own home in the city and moved into
decedent's house, occupying it from about April 27,
1903, to October 11, 1907, a period of 232 weeks.
During this period McConaughy boarded with them
and was cared for by them. He was a stone mason
by trade, and when not under the influence of liquor

able to look after himself. His habits, with which claimant and his wife were familiar, were such that at times he required a good deal of attention. He drank heavily, and sometimes suffered for days on account of his protracted sprees. He died in March, 1913. He never paid claimant anything. His property was disposed of by will to another. Claimant presented to his estate an account for board and care for the 232 weeks, and recovered in the circuit court a verdict and judgment for $1,624. There is no particular dispute over the matter of the services which were rendered by claimant and his wife to the deceased for the period during which they occupied his house, although it is claimed that the value put upon them is excessive.

While some errors are assigned upon exceptions taken to rulings admitting and rejecting testimony, the principal contention arises over the claim made by the estate that claimant and deceased had an express agreement, by the terms of which claimant was to move into the house of the deceased, board and care for him during his life, and in consideration was to have the use of his house and the property itself after his death.

In his opening statement to the jury, the attorney for the claimant stated that he would offer testimony tending to prove that the deceased said to claimant and his wife that if they would make a home for him and care for him, moving into his house, he would see that they were well paid. He also stated that testimony which he would introduce would show that deceased frequently said to Mr. and Mrs. Stoner that they were doing well by him, he appreciated what they were doing, was going to see that they were well paid for it, and that it was a common thing for him to say to Mrs. Stoner, whom he had known from her childhood:

"Kittie, I appreciate what you are doing for me. I am going to see you are well paid, and I am going to see that you have this house—this brick house for yours."

He made, also, the following statement:

"The testimony will show he told them when he came over there that he would—I think it will show he told them when they come over there that if they would stay throughout his life that he would give them the brick house; but, at least, we will say he promised to pay them well."

At this point he was interrogated by counsel for defendant, and the following colloquy occurred:

"*Mr. Peters:* Mr. Sowers, do you claim an express contract to stay with him in his lifetime?

"*Mr. Sowers:* No; we do not claim that.

"*Mr. Peters:* Isn't that the fact?

"*Mr. Sowers:* I claim he did say to them, if they would stay, that he had told them he was going to leave them the brick house; that, if they would come over there and make a home for him, he would leave them the brick house. He did tell them he would pay them well for what they had done to come in, and we are not claiming the brick house.

"*Mr. Peters:* Whether there was any such arrangement made.

"*Mr. Sowers:* There was such talk.

"*Mr. Peters:* Before they went in?

"*Mr. Sowers:* At the time they went in, and after they went in, both; he told them if they would come over there and stay there, and make a home for him and care for him, that he would pay them well for what they did care for him."

A witness for claimant testified that he had heard deceased say that claimant should be well paid, and had heard him say several times that he was going to give the brick house to Mrs. Stoner. Another witness for claimant, and the only one who appears to have any knowledge of the real arrangement, testified in substance that from the conversations of the par-

ties in his presence he understood, and the parties themselves understood, that the arrangement was as claimed on the part of the estate.

The court, refusing to direct a verdict for the estate, and refusing to instruct them as requested:

"If you find from the evidence in the case that complainant and deceased had an express contract, by the terms of which claimant was to board and care for the deceased during his lifetime, and receive in payment therefor the use or rent of the house occupied by claimant, and at the death of deceased to have the house, and claimant failed to perform his part of the agreement, violated the contract by moving out of the house, and ceased to provide deceased with board and care, then I instruct you that claimant has no right of action against this estate, and your verdict should be for the defendant"—

Instructed the jury in substance that it was admitted that claimant and his wife moved into McConaughy's house at the time above stated and remained there during the period stated, and that if they found that they were there caring for the deceased at his request, and upon his promise to pay them for services rendered, they should render a verdict in favor of claimant for such sum as they should find the services were worth under all the circumstances, unless they found that claimant went there under a contract as claimed by the estate. If they found claimant rendered the services under an express understanding and agreement that he was to furnish McConaughy board and care during his lifetime, and to receive therefor the use of the house during the time such services were to be rendered, and at his death was to have the house, and if claimant abandoned this undertaking and voluntarily quit and ceased to render services, then claimant could not recover—

"Unless you find that the acts of Mr. McConaughy made it impossible for Mr. Stoner and his wife to re-

main there. I want you to pay particular attention, and I see you are, to this, for it is quite important. If they made that contract which it is claimed by the estate they did make, they would be barred, unless you find the acts of Mr. McConaughy made it impossible for Mr. Stoner and his wife to remain there, and by that I mean some wrongful act independent of his rights under the contract committed by him, something outside of the scope of their duties or his rights, by which it is not possible for them to stay. The fact that he may have dissipated more or been more difficult to care for would not be such an act, because that was part of their contract to care for him and take care of him. If they entered into the contract as claimed by the defense, it was their duty to perform it, unless prevented by some wrongful act on the part of Mr. McConaughy outside the relations and duties under the contract, and, if they have not done so, they cannot recover."

Error is assigned upon the portion of the charge here set out; but none is assigned upon the refusal to give the requested instruction.

OSTRANDER, J. (*after stating the facts*). Reading the entire record satisfies me that the court properly refused to direct a verdict for the estate, and that the question whether claimant performed the services under an express agreement was a question for the jury. This because there is testimony which may be interpreted as meaning that deceased agreed to pay claimant well for what services he should perform, and to give him or his wife the house, if he would continue to perform them during his life. But I find in the record, which contains the substance of all the testimony given upon the trial, no testimony tending to prove that, if there was an express agreement as claimed, McConaughy committed any act making it impossible for claimant to perform it. If he abandoned performance of an express contract, he did it

181 Mich.—25.

voluntarily. The testimony upon the subject is all to this effect. However, the point is not made by counsel for appellant, who complains only that the question of whether there was an express contract was submitted to the jury, contending that such a contract is made out by undisputed testimony.

The other exceptions appear to me to be without merit, and the judgment must therefore be affirmed.

MCALVAY, C. J., and BROOKE, KUHN, STONE, BIRD, MOORE, and STEERE, JJ., concurred.